## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Monique Bell, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CVS Pharmacy, Inc.,<br><br>Defendant. | CASE NO.  21-cv-06850<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Monique Bell ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant CVS Pharmacy, Inc. ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

### INTRODUCTION

1.      This is a putative class action lawsuit on behalf of purchasers of Defendant's lidocaine patches (the "Lidocaine Patches").[1] Defendant markets, sells and distributes the Lidocaine Patches through numerous brick-and-mortar CVS retail locations and online through www.cvs.com.

_____

[1] The Lidocaine Patches include Defendant's "MAXIMUM STRENGTH Lidocaine Pain Relief Patch"; "MAXIMUM STRENGTH LIDOCAINE Cold & Hot Patch"; and "MAXIMUM STRENGTH Lidocaine Pain-Relieving Patch." Plaintiff has standing to sue Defendant for all of the Lidocaine Patches because "1) the products are substantially similar to the products that she did purchase; and 2) the alleged misrepresentation is the same." *See e.g., Rivera v. S.C. Johnson & Son, Inc.*, No. 20-CV-3588 (RA), 2021 U.S. Dist. LEXIS 183759, at *26 (S.D.N.Y. Sep. 24, 2021)

2.      Lidocaine is a topical anesthetic that is used to treat pain by blocking the transmission of pain signals from nerve endings in the skin to the spinal cord and brain. Specifically, lidocaine functions by blocking sodium channels located on nerve endings which prevents action potential from propagating in the nerve cell and thereby interrupting the transmission of the pain signal.

3.      Although lidocaine patches are often prescribed by doctors, Defendant offers its Lidocaine Patches over-the-counter to unsuspecting consumers under false pretenses. Defendant takes advantage of these consumers by prominently displaying on the packaging of the Lidocaine Patches that the patches deliver a "Maximum Strength" dose of lidocaine for up to 12 or 8 hours. Plaintiff and the proposed class members relied on those representations when making their purchases. To their dismay, however, Defendant's Lidocaine Patches regularly peel off their bodies within a few hours, and oftentimes minutes, after being properly applied, and do not deliver a maximum amount of lidocaine available in patch form.

4.      As a result of its deceptive conduct, Defendant is, and continues to be, unjustly enriched at the expense of its customers.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction over the claims asserted herein individually and on behalf of the class pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005. Subject matter jurisdiction is proper because: (1) the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs; (2) there are more than 100 Class members; (3) at least one member of the Class is diverse from the Defendant; and (4) the Defendant is not a governmental entity.

6.      This Court has personal jurisdiction over Defendant because it conducts substantial business within New York, including the sale, marketing, and advertising of the Lidocaine Patches. Furthermore, a substantial portion of the events giving rise to Plaintiff's claims occurred in this State, including Plaintiff's purchases.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

## THE PARTIES

8.      Plaintiff Monique Bell is a citizen of New York, residing in Brooklyn, New York. Plaintiff purchased Defendant's Lidocaine Pain Relief Patch for her personal use for approximately $9.79 on various occasions within the applicable statute of limitations, with her most recent purchase taking place in September of 2021. Plaintiff made these purchases at a CVS store located in Brooklyn, New York. Prior to her purchases, Plaintiff saw that the Lidocaine Patches were labeled and marketed as "Maximum Strength" patches capable of delivering a 4% lidocaine dose for "UP TO 12 HOURS" and read the directions on the back label, which indicated that she could use "1 patch for up to 12 hours."  Plaintiff relied on Defendant's representations when she decided to purchase the Lidocaine Patches over comparable and less expensive pain-relieving patches or gels. Plaintiff saw those representations prior to and at the time of her purchases and understood them as a representation and warranty that the Lidocaine Patches would reliably adhere to her body and deliver a 4% lidocaine dose for 12 hours. Initially, Plaintiff became frustrated when her Lidocaine Patches peeled off her body while engaging in regular activities—such as walking, sitting, stretching, and sleeping—well before the represented 12 hours, through no fault of her own. Plaintiff, nonetheless, continued to purchase other

Lidocaine Patches, believing that such failures were the result of one-off manufacturing flukes. After giving the Lidocaine Patches the benefit of the doubt, however, Plaintiff stopped purchasing them altogether after realizing that the Lidocaine Patches consistently failed to provide pain relief by delivering a 4% lidocaine dose for "UP TO 12 HOURS." For example, on a couple of occasions, the Lidocaine Patches that Plaintiff bought peeled off her body within an hour or two after she properly applied them pursuant to the directions contained on the products—delivering little to no analgesic effect to her sore muscles. Plaintiff relied on Defendant's representations and warranties in deciding to purchase her Lidocaine Patches. Accordingly, those representations and warranties were part of the basis of her bargains, in that she would not have purchased her Lidocaine Patches on the same terms had she known those representations and warranties were false. However, Plaintiff remains interested in purchasing Defendant's Lidocaine Patches and would consider the Lidocaine Patches in the future if Defendant ensured the products actually provide pain relief by delivering a 4% lidocaine dose to her body for "UP TO 12 HOURS." Additionally, in making her purchases, Plaintiff paid a substantial price premium due to Defendant's false and misleading claims regarding the qualities of its Lidocaine Patches. However, Plaintiff did not receive the benefit of her bargains because her Lidocaine Patches did not, in fact, provide pain relief by delivering a 4% "Maximum Strength" dose of lidocaine to her body for "UP TO 12 HOURS."

9.      Defendant CVS Pharmacy, Inc. ("Defendant") is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island. Defendant markets, sells, and distributes the Lidocaine Patches and is responsible for the advertising, marketing, trade dress, and packaging of the Lidocaine Patches. Defendant marketed, distributed, and sold the Lidocaine Patches during the class period.

**FACTUAL ALLEGATIONS**

*Defendant's False Advertising*

10.     Defendant markets, sells, and distributes the Lidocaine Patches through numerous brick-and-mortar CVS retail locations and online through www.cvs.com. On the Lidocaine Patches packaging, Defendant represents that its Lidocaine Patches last up to 12 or 8 hours, depending on the product. The Lidocaine Patches are all substantially similar in that they all share similar adhesiveness misrepresentations:



11.     By representing that Lidocaine Patches can be applied "UP TO 12 HOURS" or "UP TO 8 HOURS"—a very specific number[2]—Defendant induced Plaintiff and the proposed class members into believing that the Lidocaine Patches: (1) would continuously adhere to their bodies up to 12 or 8 hours; (2) were sufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping) for someone who is suffering from sore muscles; and (3) would continuously relieve pain by providing a 4% lidocaine dose throughout the specified

_____

[2]Although under 2nd Circuit precedent in *Mantikas v. Kellogg Co.*, 910 F.3d 633, 637 (2d Cir. 2018) reasonable consumers are not "expected to look beyond misleading representations on the front of the box" to cure a defendant's misrepresentation contained therein, the back labels of the Lidocaine Patches reinforce the misrepresentations made on their front labels—i.e., they all misleadingly instruct either to "use 1 patch for up to 12 hours" or to "remove the patch from the skin after, at most, 8-hour application." Exhibit A.

amount of time represented therein. Furthermore, by representing that the Lidocaine Patches provide "Maximum Strength," Defendant induced Plaintiff and the proposed class members into believing that the Lidocaine Patches: (1) contain and deliver the maximum amount of lidocaine available in patch form; and (2) that they are superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

12.     Despite these representations, however, Defendant's Lidocaine Patches: (1) systematically fail to adhere to its consumers' bodies up to 12 or 8 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain by providing a 4% lidocaine dose throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not provide the maximum amount of lidocaine available in patch form; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

### *Defendant's Knowledge of the Defective Lidocaine Patches*

13.     Defendant knew that its Lidocaine Patches did not live up to the adhesiveness representations contained therein based on dozens of complaints posted on its own website, www.cvs.com, which Defendant actively monitors.

14.     For example, in May of 2021, a buyer explained their issue trying to get a Lidocaine Patch to adhere to their body:

> "Absolutely awful. Active ingredient doesn't matter because the delivery method doesn't stick at all. Post-it notes have better adhesion. Spend a couple extra bucks and get something that will stay on."[3]

---

[3] https://www.cvs.com/shop/cvs-health-lidocaine-patch-max-strength-5-ct-prodid-1910091 (last accessed December 10, 2021).

15.     In June of 2020, yet another consumer expressed their frustration using

Defendant's Lidocaine Patch:

> "If I could give negative stars I would. These simply do not stay on. Obviously
> this is a real problem with this product since so many reviews reflect the same
> opinion. If you're going to claim that your product is comparable to another, you
> should at least assure that it is able to be compared to said product. I am unable
> to compare it when it won't even stay put! Complete waste of money."[4]

16.     Furthermore, Defendant knew, or should have known, that its Lidocaine Patches

were defectively designed based on FDA reports and scientific studies regarding the efficacy of

the products.

17.     Specifically, Defendant's Lidocaine Patches work by delivering lidocaine through

a transdermal mechanism—i.e., by delivering the analgesic chemical "through the dermis, or

skin…in ointment or patch form."[5] According to FDA reports, transdermal drug delivery

systems, such as the one used by Defendant, systematically fail to adhere to the body.[6] To that

end, the FDA is in the process of finalizing an industry guidance on "Transdermal and Topical

Delivery Systems" to address, *inter alia*, "considerations for areas where quality is closely tied to

product performance and potential safety issues, such as adhesion failure…"[7]

---

[4] https://www.cvs.com/shop/cvs-health-maximum-strength-pain-relief-patch-3-5-16-x-5-1-2-10-cm-x-14-cm-5-ct-prodid-1730040 (last accessed December 10, 2021).

[5] https://medical-dictionary.thefreedictionary.com/transdermal (last accessed December10, 2021).

[6] *See* Yellela S.R. Krishnaiah, *FDA Perspectives on Product Quality of Transdermal Drug Delivery Systems*, PhD Division of Product Quality Research OTR/OPQ/CDER US Food and Drug Administration Silver Spring, MD, USA AAPSKrishnaiah, October 2015_Sunrise Session (2015). https://healthdocbox.com/Deafness/74997073-Fda-perspectives-on-product-quality-of-transdermal-drug-delivery-systems.html (last accessed December 10, 2021). at pg. 8.

[7] *See* 84 FR 64319 - *Transdermal and Topical Delivery Systems-Product Development and Quality Considerations; Draft Guidance for Industry*; Availability (2019) https://www.regulations.gov/document/FDA-2019-D-4447-0001 (last accessed December 10, 2021).

18.     Even more alarming, the FDA Adverse Events Reporting System reports that

approximately 70% of concerns stemming from lidocaine patches involve their poor adhesion.[8]

19.     Furthermore, a peer-reviewed study published in January of 2021 by the Journal

of Pain Research found that 0% of generic prescription lidocaine patches had a >90% adhesion

rate to the study's subjects after 12 hours (i.e., essentially no part of the product lifting off the

skin).[9] The study also found that after 12 hours, "37.5% of subjects experienced substantial

detachment (to <10% adhesion) while using the generic lidocaine patch 5%, including 7 (29.1%)

complete detachments." The study also found that the mean adhesiveness score of the generic

lidocaine patches after 12 hours was 37.67 (where 0% reflects complete detachment and 50%

reflects half the product lifting off the skin but not detached). In contrast, the study found that a

newly developed 1.8% lidocaine patch technology, which is bioequivalent to 5% lidocaine

patches,[10] maintained a mean adhesion >90% across all time points (0, 3, 6, 9, and 12 h).

---

[8] *See* Gudin J, Nalamachu S. *Utility of lidocaine as a topical analgesic and improvements in patch delivery systems*. *Postgrad Med*. 2020;132(1):28–36. doi:10.1080/00325481.2019.1702296 https://www.tandfonline.com/doi/full/10.1080/00325481.2019.1702296 (last accessed December 10, 2021).

[9] See Gudin J, Webster LR, Greuber E, Vought K, Patel K, Kuritzky L. *Open-Label Adhesion Performance Studies of a New Lidocaine Topical System 1.8% versus Lidocaine Patches 5% and Lidocaine Medicated Plaster 5% in Healthy Subjects*. *J Pain Res*. 2021;14:513-526. Published 2021 Feb 23. doi:10.2147/JPR.S287153.
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7914064/ (last accessed December 10, 2021). The study measured adhesion of the patches "immediately after application (0 hours) and at 3, 6, 9, and 12 hours (±15 minutes; before product removal) after application. Assessments in Study 1 were performed by a trained scorer using the FDA-recommended 5-point adhesion scale. The FDA scale ranges from 0 to 4, where 0 represents ≥90% of the product adhered (essentially no part of the product lifting off the skin), 1 represents 75% to <90% adhered (only some edges of the product lifting off the skin), 2 represents 50% to <75% adhered (less than half the product lifting off the skin), 3 represents >0% to <50% adhered (more than half the product lifting off the skin but not detached), and 4 represents 0% adhered (complete product detachment). The mean cumulative adhesion score was calculated by summing the scores at 3, 6, 9, and 12 hours and dividing the total by the total number of observations per subject." *Id.*

[10] Gudin J, Argoff C, Fudin J, Greuber E, Vought K, Patel K, Nalamachu S. *A Randomized, Open-Label, Bioequivalence Study of Lidocaine Topical System 1.8% and Lidocaine Patch 5% in Healthy Subjects*. J Pain Res. 2020 Jun 22;13:1485-1496. doi: 10.2147/JPR.S237934. PMID:

20.    Although the study published by the Journal of Pain Research only tested generic prescription lidocaine patches, upon information and belief, Defendant's over-the-counter Lidocaine Patches—which have not undergone the rigorous approval process required by the FDA and use the same outdated and defective adhesion technology as the generic lidocaine patches[11] —fair no better.

21.    Furthermore, while certain companies have innovated their technology based on clinical studies to ensure that their lidocaine patches reliably adhere to a consumer's body,[12] even while exercising,[13] upon information and belief, Defendant has not.

22.    In complete disregard of the wealth of information to the contrary, however, Defendant continues to misrepresent that its Lidocaine Patches reliably adhere to its consumers' bodies up to 12 or 8 hours when, in fact, they do not. Defendant also failed to inform its consumers that the Lidocaine Patches are prone to even greater detachment when they engage in certain activities (such as walking, stretching, and sleeping). Nor is Defendant's representation that its Lidocaine Patches are capable of continuously relieving pain by providing a 4% lidocaine

---

32606914; PMCID: PMC7319520. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7319520/ (last accessed December 10, 2021).

[11] Defendant, whose Lidocaine Patches are manufactured in China, has not been approved by the FDA to market or sell its Lidocaine Patches despite being required to do so. The FDA is currently reviewing a Citizen Petition filed by Scilex Pharmaceuticals Inc. (a manufacturer of FDA-approved lidocaine patches) to remove from the market any over-the-counter lidocaine patches that lack FDA approval. *See* https://www.regulations.gov/docket/FDA-2019-P-0417/document (last accessed December 10, 2021).

[12] https://www.scilexpharma.com/scilex-presents-ztlido-data-on-superior-adhesion-over-lidocaine-patch-formulation/ (last accessed December 10, 2021).

[13] A separate study demonstrated that Scilex's lidocaine patches were able to reliably adhere when subjects engaged in moderate physical exercise (exercise bike) and heat (heating pad). *See* Fudin J, Wegrzyn EL, Greuber E, Vought K, Patel K, Nalamachu S. *A Randomized, Crossover, Pharmacokinetic and Adhesion Performance Study of a Lidocaine Topical System 1.8% During Physical Activity and Heat Treatment in Healthy Subjects. J Pain Res.* 2020;13:1359-1367. Published 2020 Jun 10. doi:10.2147/JPR.S238268. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7293912/#CIT0007 (last accessed December 10, 2021).

dose throughout the specified time periods true: given that they systematically fail to fully adhere to its consumers' bodies. This is crucial because "[a]dequate adhesion is a critical quality attribute for topical delivery systems; if the product lifts or detaches during wear, dosing may be compromised and there is an increased risk of inadvertent exposure to others."[14]

23.     To make matters worse, Defendant misrepresents, without providing adequate disclaimers, that its Lidocaine Patches provide a "Maximum Strength" dose of lidocaine, when, in fact, there are superior lidocaine patches in the market that deliver a higher amount of lidocaine: including the previously mentioned 5% and 1.8% prescription-strength lidocaine patches.[15] Defendant compounds this problem by indicating that its "MAXIMUM STRENGTH LIDOCAINE Cold & Hot Patch" is "Medicated"—thereby reinforcing the misrepresentation that the Lidocaine Patches are comparable to prescription-strength lidocaine patches.

24.     Furthermore, nothing in Defendant's Lidocaine Patches indicates that they provide a greater dose of lidocaine in comparison to other over-the-counter lidocaine patches, including its own. Specifically, Defendant's representation that its Lidocaine Patches contain 4% lidocaine is misleading because the actual strength of a lidocaine patch is measured by the "mass of drug relative to the mass of the adhesive per patch."[16] In other words, Defendant's representation that its Lidocaine Patches contain 4% lidocaine does not indicate the *actual* amount of lidocaine milligrams that its Lidocaine Patches deliver to a consumer's body.[17]

---

[14] *See supra* footnote 10.

[15] *Id.*

[16] *See* Scilex Pharmaceuticals Inc.'s Citizen Petition. Exhibit B at pg. 19.

[17] "It is emphasized that most of these patch products are labeled as a percentage strength, without providing the total drug content per patch. For other topical dosage forms like creams, ointments, and lotions, the amount of drug administered can easily be determined by weighing the mass of product and applying the strength factor as illustrated in the table below. In contrast, the amount of drug applied for patch products cannot easily be determined because the exact mass of adhesive applied cannot be estimated due to the contributing mass of the backing materials. inasmuch as patches are manufactured in a variety of sizes and thicknesses, the drug

25.     Shockingly, and by way of illustration, Defendant labels its "MAXIMUM STRENGTH LIDOCAINE Cold & Hot Patch" as possessing "MAXIMUM STRENGTH LIDOCAINE" although it has a lesser amount of lidocaine per patch (240 milligrams)[18] than its "MAXIMUM STRENGTH Lidocaine Pain Relief Patch" and "MAXIMUM STRENGTH Lidocaine Pain-Relieving Patch," both of which contain 567 milligrams of lidocaine per patch.[19][20] Further, all of Defendant's Lidocaine Patches contain less lidocaine than other over-the-counter lidocaine patches: which range from 600 to 4,500 milligrams.[21] Defendant's arbitrary and patently false claim regarding the strength of its Lidocaine Patches goes beyond the pale.

26.     Had Defendant not made the false, misleading, and deceptive misrepresentations and omissions alleged herein, Plaintiff and the proposed class members would not have purchased the Lidocaine Patches or would not have paid as much as they did for those purchases. Thus, Plaintiff and the proposed class members suffered an injury in fact and lost money or property as a result of Defendant's wrongful conduct.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action on behalf of herself and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3).

28.     The class periods shall be defined from the date of the filing of this Complaint, back to any such time the Court deems appropriate.

---

exposure from patches is unknown and cannot be estimated by reviewing the product label, unless the manufacturer discloses the drug mass. Many of the patch products exclude this from their labels, and the absence of this information on unapproved OTC product labels creates a safety risk." Ex. B at pg. 20.

[18] https://ndclist.com/ndc/66902-220 (last acesed December 10, 2021).

[19] https://ndclist.com/ndc/66902-215 (last acesed December 10, 2021).

[20] https://ndclist.com/ndc/66902-276 (last acesed December 10, 2021).

[21] *See* Attachment 1 to Scilex Pharmaceuticals Inc.'s Citizen Petition. Exhibit C.

29.     Plaintiff seeks to represent all persons in the United States who purchased Defendant's Lidocaine Patches (the "Class").

30.     Plaintiff also seeks to represent a subclass of all Class members who purchased Defendant's Lidocaine Patches in New York (the "New York Subclass") (collectively with the Class, the "Classes").

31.     The Classes do not include (1) Defendant, its officers, and/or its directors; or (2) the Judge to whom this case is assigned and the Judge's staff.

32.     Plaintiff reserves the right to amend the above class definitions and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

33.     *Community of Interest*: There is a well-defined community of interest among members of the Classes, and the disposition of the claims of these members of the Classes in a single action will provide substantial benefits to all parties and to the Court.

34.     *Numerosity*: While the exact number of members of the Classes is unknown to Plaintiff at this time and can only be determined by appropriate discovery, upon information and belief, members of the Classes number in the millions. The precise number of the members of the Classes and their identities are unknown to Plaintiff at this time but may be determined through discovery. Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

35.     *Existence and predominance of common questions of law and fact*: Common questions of law and fact exist as to all members of the Classes and predominate over any

questions affecting only individuals of the Classes. These common legal and factual questions include, but are not limited to:

    (a)  Whether the Lidocaine Patches are defective;

    (b)  Whether Defendant knew of the Lidocaine Patches' defective nature;

    (c)  Whether Defendant breached the express warranties on the Lidocaine Patches' packaging;

    (d)  Whether Defendant breached the Lidocaine Patches' implied warranty of merchantability;

    (e)  Whether Defendant breached the Lidocaine Patches' implied warranty of fitness for use;

    (f)  Whether Defendant's representations that the Lidocaine Patches adhere "UP TO 12 HOURS" or "UP TO 8 HOURS" or otherwise provides "Maximum Strength" lidocaine dosing is false and misleading in violation of New York's consumer-protection statutes;

    (g)  Whether Plaintiff and the members of the Classes have suffered damages as a result of Defendant's actions and the amount thereof;

    (h)  Whether Plaintiff and the members of the Classes are entitled to statutory damages;

    (i)  Whether Plaintiff and the members of the Classes are entitled to restitution;

    (j)  Whether Plaintiff and the members of the Classes are entitled to injunctive relief to enjoin Defendant from further engaging in these wrongful practices; and

    (k)  Whether Plaintiff and the members of the Classes are entitled to attorney's fees and costs.

36.    *Typicality:* The claims of the named Plaintiff are typical of the claims of other members of the Classes in that the named Plaintiff was exposed to Defendant's false and misleading marketing, purchased Defendant's defective Lidocaine Patches, and suffered a loss as a result of those purchases.

37.    *Adequacy*: Plaintiff will fairly and adequately represent and protect the interests of the Classes as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff is an adequate representative of the Classes because she has no interests which are adverse to the interests of the members of the Classes. Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained skilled and experienced counsel, and by providing a cure-notice to Defendant regarding the Lidocaine Patches' defects on behalf of the members of the Classes to protect their interests.

38.    *Superiority:* A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a) The expense and burden of individual litigation makes it economically unfeasible for members of the Classes to seek to redress their claims other than through the procedure of a class action;

(b) If separate actions were brought by individual members of the Classes, the resulting duplicity of lawsuits would cause members of the Classes to seek to redress their claims other than through the procedure of a class action; and

(c) Absent a class action, Defendant likely will retain the benefits of its wrongdoing, and there would be a failure of justice.

**CAUSES OF ACTION**

**COUNT I**
**Violation of New York's Warranty Act, N.Y. U.C.C. § 2-313**
**(On Behalf of Plaintiff and the New York Subclass)**

39.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

40.     Defendant's Lidocaine Patches are goods as defined in N.Y. U.C.C. § 2-105(1).

41.     Plaintiff and the New York Subclass members are buyers as defined in N.Y. U.C.C. § 2-103(1)(a).

42.     Defendant is a seller as defined in 15 N.Y. U.C.C. § 2-103(1)(d).

43.     15 N.Y. U.C.C. § 2-607 is satisfied because Plaintiff provided Defendant a reasonable opportunity to cure the defects contained in the Lidocaine Patches by sending Defendant a cure notice outlining those defects in full via certified mail on October 20, 2021.

44.     N.Y. U.C.C. § 2-313 provides a cause of action to buyers when sellers breach express warranties.

45.     On the Lidocaine Patches' packaging, Defendant expressly warranted that its Lidocaine Patches were capable of providing pain relief by delivering a 4% lidocaine dose for "UP TO 12 HOURS" or "UP TO 8 HOURS," depending on the product.

46.     Furthermore, on the Lidocaine Patches packaging, Defendant expressly warranted that its Lidocaine Patches provide a "Maximum Strength" dose of lidocaine in comparison to other over-the-counter and/or prescription-strength lidocaine patches.

47.     Those statements became the basis of the bargains for Plaintiff and the New York Subclass members because they are factual statements that a reasonable consumer would consider material when purchasing a lidocaine patch.

48.     Defendant breached these express warranties by delivering Lidocaine Patches that: (1) systemically fail to adhere to its consumers' bodies up to 12 or 8 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain by delivering a 4% lidocaine dose throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not provide the maximum amount of lidocaine available in patch form; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

49.     In so doing, Defendant breached N.Y. U.C.C. § 2-313.

50.     As a direct and proximate result of Defendant's breach of its express written warranties, Plaintiff and the New York Subclass members have been damaged in an amount to be proven at trial.

## COUNT II
### Violation of New York's Warranty Act, N.Y. U.C.C. § 2-314
### (On Behalf of Plaintiff and the New York Subclass)

51.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

52.     Defendant's Lidocaine Patches are goods as defined in N.Y. U.C.C. § 2-105(1).

53.     Plaintiff and the New York Subclass members are buyers as defined in N.Y. U.C.C. § 2-103(1)(a).

54.     Defendant is a seller as defined in 15 N.Y. U.C.C. § 2-103(1)(d).

55.     15 N.Y. U.C.C. § 2-607 is satisfied because Plaintiff provided Defendant a reasonable opportunity to cure the defects contained in the Lidocaine Patches by sending Defendant a cure notice outlining those defects in full via certified mail on October 20, 2021.

56.     N.Y. U.C.C. § 2-314(1) creates an implied warranty of merchantability when a seller "is a merchant with respect to goods of that kind."

57.     Defendant is a merchant as defined in 15 N.Y. U.C.C. § 2-104(1) because it deals in goods in the kind (i.e., selling Lidocaine Patches) and holds itself out as having knowledge or skill peculiar to the practices or goods involved (i.e., selling pharmaceutical goods).

58.     For goods to be merchantable, they must be "fit for the ordinary purposes for which such goods are used." N.Y. U.C.C. § 2-314(2)(c).

59.     Defendant breached its implied warranties of merchantability by selling to Plaintiff and the New York Subclass members Lidocaine Patches which systematically peeled off their bodies well before they ought to be fit as an analgesic for sore muscles.

60.     In so doing, Defendant breached N.Y. U.C.C. § 2-314(2)(c).

61.     For goods to be merchantable, they must also "conform to the promises or affirmations of fact made on the container or label if any." N.Y. U.C.C. §§ 2-314(2)(f).

62.     On the Lidocaine Patches' packaging, Defendant promised and otherwise made affirmations of fact that the Lidocaine Patches were capable of providing pain relief by delivering a 4% lidocaine dose for "UP TO 12 HOURS" or "UP TO 8 HOURS," depending on the product.

63.     Furthermore, on the Lidocaine Patches packaging, Defendant promised and otherwise made affirmations of fact that those Patches provide a "Maximum Strength" dose of lidocaine in comparison to other available over-the-counter and/or prescription-strength lidocaine patches.

64.     Defendant's Lidocaine Patches did not conform to those promises and affirmations of fact because they: (1) systemically fail to adhere to its consumers' bodies up to

17

12 or 8 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain by delivering a 4% lidocaine dose throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not provide the maximum amount of lidocaine available in patch form; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

65.     In so doing, Defendant breached N.Y. U.C.C. § 2-314(2)(f).

66.     As a direct and proximate result of Defendant's breach of its implied warranties of merchantability, Plaintiff and the New York Subclass members have been damaged in an amount to be proven at trial.

<u>**COUNT III**</u>
**Violation of New York's Warranty Act, N.Y. U.C.C. § 2-315**
**(On Behalf of Plaintiff and the New York Subclass)**

67.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

68.     Defendant's Lidocaine Patches are goods as defined in N.Y. U.C.C. § 2-105(1).

69.     Plaintiff and the New York Subclass members are buyers as defined in N.Y. U.C.C. § 2-103(1)(a).

70.     Defendant is a seller as defined in 15 N.Y. U.C.C. § 2-103(1)(d).

71.     15 N.Y. U.C.C. § 2-607 is satisfied because Plaintiff provided Defendant a reasonable opportunity to cure the defects contained in the Lidocaine Patches by sending Defendant a cure notice outlining those defects in full via certified mail on October 20, 2021.

72.     N.Y. U.C.C. § 2-315 provides a cause of action when "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods."

73.     Defendant knew that the Lidocaine Patches that it sold to Plaintiff and the New York Subclass members were designed for the specific purpose of providing analgesic effects to sore muscles.

74.     Lacking the requisite pharmacological knowledge to evaluate the efficacy of the Lidocaine Patches, Plaintiff and the New York Subclass members relied on Defendant's skill and judgment as a reputable pharmaceutical company when they chose to buy the Lidocaine Patches.

75.     Defendant breached its implied warranties of fitness for use by selling to Plaintiff and the New York Subclass members Lidocaine Patches which systematically peeled off their bodies well before they ought to be fit as an analgesic for sore muscles.

76.     In so doing, Defendant breached N.Y. U.C.C. § 2-315.

77.     As a direct and proximate result of Defendant's breach of its implied warranties of fitness for use, Plaintiff and the New York Subclass members have been damaged in an amount to be proven at trial.

**COUNT IV**
**Violation Of The Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.***
**(On Behalf of Plaintiff and the Class)**

78.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

79.     15 U.S.C. § 2310(d) is satisfied because Plaintiff properly invokes jurisdiction under the Class Action Fairness Act ("CAFA").

80.     15 U.S.C. § 2310(e) is satisfied because Plaintiff provided Defendant a reasonable opportunity to cure the defects contained in the Lidocaine Patches by sending Defendant a cure notice outlining those defects in full via certified mail on October 20, 2021.

81.     15 U.S.C. § 2310(d)(1) provides a cause of action to "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation…under a written warranty, implied warranty, or service contract."

82.     Defendant's Lidocaine Patches are consumer products as defined in 15 U.S.C. § 2301(1).

83.     Plaintiff and the Class members are consumers as defined in 15 U.S.C. § 2301(3).

84.     Defendant is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5).

85.     15 U.S.C. § 2301(6)(A) defines "written warranty" as "any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship…will meet a specified level of performance over a specified period of time."

86.     Defendant provided Plaintiff and the Class members "written warranties" within the meaning of 15 U.S.C. § 2301(6) by providing written promises and affirmations of fact on the Lidocaine Patches' packaging that they were capable of providing pain relief by delivering a 4% lidocaine dose for "UP TO 12 HOURS" or "UP TO 8 HOURS," depending on the product.

87.     Furthermore, on the Lidocaine Patches packaging, Defendant provided written promises and affirmations of fact that those Patches provide a "Maximum Strength" dose of lidocaine in comparison to other over-the-counter and/or prescription-strength lidocaine patches.

88.     Those statements became the basis of the bargains for Plaintiff and the Class members because they are factual statements that a reasonable consumer would consider material when purchasing a lidocaine patch.

89.     Defendant breached these express warranties by delivering Lidocaine Patches that: (1) systemically fail to adhere to its consumers' bodies up to 12 or 8 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain by delivering a 4% lidocaine dose throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not provide the maximum amount of lidocaine available in patch form; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

90.     Further, Defendant breached its implied warranties of merchantability and fitness for use due to its breaches of N.Y. U.C.C. §§ 2-314, 15, as set forth above. 15 U.S.C. § 2301(7).

91.     As a direct and proximate result of Defendant's breach of its express and implied warranties, Plaintiff and the Class members have been damaged in an amount to be proven at trial.

**COUNT V**
**Violation of New York G.B.L. § 349**
**(On Behalf of Plaintiff and the New York Subclass)**

92.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

93.     New York's General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

94.     In its sale of Lidocaine Patches throughout the State of New York, at all relevant times herein, Defendant conducted business and trade within the meaning and intendment of New York's General Business Law § 349.

95.     Plaintiff and the New York Subclass members are consumers who purchased the Lidocaine Patches from Defendant for their personal use.

96.     By the acts and conduct alleged herein, Defendant engaged in deceptive, unfair, and misleading acts and practices, which include, without limitation, (i) misrepresenting the efficacy of the Lidocaine Patches on their packaging (i.e., that they were capable of providing pain relief by delivering a 4% lidocaine dose to its consumers' bodies for "UP TO 12 HOURS" or "UP TO 8 HOURS," despite their systematic failure to do so); (ii) omitting that the Lidocaine Patches are prone to even greater detachment when consumers engage in certain activities: such as walking, stretching, or sleeping; and (iii) misrepresenting that Lidocaine Patches provide a "Maximum Strength" dose of lidocaine in comparison to other over-the-counter and/or prescription-strength lidocaine patches when, in fact, the Lidocaine Patches do not provide the maximum amount of lidocaine available in patch form and are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

97.     The foregoing deceptive acts and practices were directed at consumers.

98.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the intrinsic qualities of the Lidocaine Patches.

99.     As a result of Defendant's deceptive practices, Plaintiff and the New York Subclass members suffered an economic injury because (a) they would not have purchased the Lidocaine Patches had they known the veracity of Defendant's misrepresentations and omissions,

and (b) they overpaid for the Lidocaine Patches on account of such misrepresentations and omissions.

100.    On behalf of herself and the New York Subclass members, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover their actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees and costs.

**COUNT VI**
**Violation of New York G.B.L. §350**
**(On Behalf of Plaintiff and the New York Subclass)**

101.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

102.    New York's General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

103.    Defendant violated New York General Business Law § 350 by falsely advertising on the Lidocaine Patches' packaging that the Lidocaine Patches would reliably provide pain relief by delivering a 4% lidocaine dose to its consumers' bodies for "UP TO 12 HOURS" or "UP TO 8 HOURS," when, in fact, they systematically fail to do so.

104.    Furthermore, Defendant violated New York General Business Law § 350 by omitting that the Lidocaine Patches are prone to even greater detachment when consumers engage in certain activities: such as walking, stretching or sleeping.

105.    Finally, Defendant violated New York General Business Law § 350 by misrepresenting that the Lidocaine Patches provide a "Maximum Strength" dose of lidocaine in comparison to other over-the-counter and/or prescription-strength lidocaine patches when, in fact, the Maximum Strength Lidocaine Patches do not provide the maximum amount of

lidocaine available in patch form and are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

106.    The foregoing advertising was directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

107.    Defendant's misrepresentations and omissions have resulted in consumer injury or harm to the public interest.

108.    As a result of Defendant's false advertising, Plaintiff and the New York Subclass members suffered an economic injury because (a) they would not have purchased the Lidocaine Patches had they known the veracity of Defendant's misrepresentations and omissions, and (b) they overpaid for the Lidocaine Patches on account of such misrepresentations and omissions.

109.    On behalf of herself and the New York Subclass members, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiff as representative of the Classes; and naming Plaintiff's attorney as Class Counsel to represent the Classes;

(b)    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(c)    For compensatory and punitive damages in amounts to be determined by the

Court and/or jury;

      (d)     For prejudgment interest on all amounts awarded;

      (e)     For an order of restitution and all other forms of equitable monetary relief;

      (f)     For injunctive relief as pleaded or as the Court may deem proper; and

      (g)     For an order awarding Plaintiff and the Classes their reasonable attorneys' fees

and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: December 11, 2021          Respectfully submitted,

          **GUCOVSCHI ROZENSHTEYN, PLLC**

          By:    */s/ Adrian Gucovschi*
                   Adrian Gucovschi

          Adrian Gucovschi
          630 Fifth Avenue, Suite 2000
          New York, NY 10111
          Telephone: (212) 884-4230
          E-Mail: adrian@gr-firm.com

          *Attorney for Plaintiff*